**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**February 8, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2022AP1051-CRAC**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2015CF144**

**IN COURT OF APPEALS**
**DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

THOMAS E. EAKE,

   DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Winnebago County: SCOTT C. WOLDT, Judge. *Affirmed.*

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Thomas E. Eake appeals from an order of the circuit court denying his petition to modify his bifurcated sentence so as to grant him early release from the confinement portion of his sentence. He contends the court erred in concluding he failed to meet his burden of proving sentence modification is warranted. For the following reasons, we affirm.

## Background

¶2 Upon his plea, Eake was convicted in 2015 of second-degree sexual assault of a child based upon a lengthy sexual relationship he began with a fourteen-year-old neighbor girl. Eake was fifty-two when the assaults began. The victim told police Eake first had sex with her in June 2012 and then almost weekly thereafter, "probably about 100 times," over the following two years. According to the complaint, when the victim's mother learned of the assaults and called the police, the victim informed Eake of this, and Eake told her she should tell the police they only had sex "one time." When the girl's mother asked Eake how many times he had had sex with her daughter, he told the mother "it only happened one time." Following his plea, Eake admitted to the probation/parole agent who prepared Eake's presentence investigation report (PSI) and to the circuit court at sentencing that he had sex with the victim "20 times." Eake was sentenced to ten years of initial confinement followed by five years of extended supervision.

¶3 In March 2022, Eake filed a petition seeking early release from confinement under Wis. Stat. § 302.113(9g) (2019-20)[1] based upon an

_____

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

"extraordinary health condition." January 2022 affidavits submitted with the petition indicate Eake has a significantly shortened life expectancy because of cancer. After reviewing the matter, the Department of Corrections Program Review Committee (PRC) determined the "public interest would be served" by granting Eake's request for early release, and the Department of Corrections (DOC) requested that the circuit court hold a hearing on the petition.

¶4 The local district attorney's office opposed Eake's early release request, stating in part that "[i]n reviewing the materials contained within [the DOC's] referral, it is clear that Mr. Eake continues to fail to recognize the severity of his actions. He continues to blame the victim and provide excuses for his behavior." The circuit court denied Eake's petition, stating in short order that "it does not meet the public interest."

### *Discussion*

¶5 Under WIS. STAT. § 302.113(9g)(b), (f), certain inmates, such as Eake, may petition for early release from the confinement portion of their bifurcated sentence, with the remaining confinement time then being added on to the extended supervision portion of their sentence. Upon receiving such a petition, the PRC at the prison where the inmate is confined determines whether, in its opinion, early release would serve the public interest. Sec. 302.113(9g)(c), (cm). If the PRC determines early release is in the public interest,[2] as the PRC did in this case, it "approve[s] the petition for referral to the sentencing court and notif[ies]

---

[2] In deciding whether early release is in the public interest, the PRC may consider the following factors: (1) risk to the community, (2) institutional adjustment, (3) program participation, (4) impact on department resources, and (5) release plan. WIS. ADMIN. CODE § DOC 302.41(12).

the department of its approval." Sec. 302.113(9g)(cm). The DOC then refers the petition to the sentencing court, which must hold a hearing to determine "whether the public interest would be served" by the requested modification, a showing the petitioner must make "by the greater weight of the credible evidence." Sec. 302.113(9g)(d), (e).

¶6 On appeal, we may reverse the circuit court's decision granting or denying a petition "only if [we] determine[] that the sentencing court erroneously exercised its discretion." *See* WIS. STAT. § 302.113(9g)(h). If the court fails to explain its decision, as the court so failed in this case, we "may search the record to determine if it supports" the decision. *See **Randall v. Randall***, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737. Searching the record in this case, we conclude the court did not erroneously exercise its discretion in denying Eake's petition.

¶7 At sentencing,[3] it became clear that when Eake's offense first came to light, Eake attempted to greatly minimize its significance, telling the victim's mother—and telling the victim to so inform authorities—that he only had sex with the victim "one time." By the time of sentencing, he had admitted to the presentence investigation writer and the circuit court that he had sex with her "around 20 times." The victim reported that after Eake had sex with her for the first time in June 2012, he continued to do so almost weekly, "probably about 100 times," over the following two years.

---

[3] The same judge presided over Eake's sentencing and the denial of his petition.

¶8     Prior to his sentencing, Eake failed to accept responsibility for his criminal conduct, attempted to frame himself in the best possible light despite the truth, and tended to place significant blame for his crime on the victim.   He expressed to the PSI writer, for example, "I think she actually wanted it more than I did."   The writer noted that Eake "denies ever cheating on his wife," yet points out that he began having sex with the victim more than six months before his wife passed away.   Eake reported to the writer that "he does not view pornography or engage in any sexual fetishes," yet the victim reported "she would have to help him fix his computer due to pornography on it.   She reported she remembered deleting titles of 'Mother Daughter with Baby Sitter', 'Dad walks in on a Baby Sitter', and 'Mother with Twins.'"[4]   Eake also expressed that he "believes fifteen and sixteen[-year-olds] are old enough to decide for themselves if they are ready to have sex."

¶9     The PSI writer's "[i]mpressions" were that Eake lacked remorse, blamed his victim and "fail[ed] to identify the inappropriateness of a sexual relationship with a teenage girl."   The writer added that Eake "clearly lives by a set of values that are not accepted by society.   His deviant sexual thinking is the driver of his behaviors."   The writer further noted that "[w]hile [Eake] would have the court believe his wife's death and subsequent depression was the reason he assaulted his victim, he began assaulting his victim months prior to his wife's heart attack and death."   The writer opined that Eake "is in need of long term sex offender treatment (SO-4) which is only available in a correctional facility."

---

[4] It is common knowledge that babysitters are very frequently teenage girls.  We note that the record also indicates Eake began dating the victim's mother after his wife died, which caused the victim's behavior toward her mother to become more hostile.

¶10    Doctor Steven Kaplan, who conducted a psychosexual evaluation of Eake and prepared a report *on his behalf* prior to sentencing, indicated that Eake

> was not altogether open about the events that led to his charges. His narrative minimizes his responsibility for the victim's complaints, and the available data imply that he is externalizing some of the blame. He expressed regret, mostly because of what he fears will happen to him, rather than because of the effects that his choices may have had on [the victim].

The report indicates that, according to Eake, the day after he first kissed the victim, she called him to come over to her house, and they then had sex. The report continues, "[h]e denied having sex with her again for a long period of time, but other statements he made to me *contradicted this assertion*."[5] (Emphasis added.) Eake appeared to blame the victim for the first time he had intercourse with her because she had called Eake over to her house. Eake expressed to Kaplan that "[h]e feels [the victim] was the primary instigator of most of their sexual encounters" and that he viewed her as "hyper-mature." The report continues:

> [Eake's] narration reveals some cognitive distortion of the events that led to his arrest. He minimizes his active role, and he told himself that [the victim] was equally interested in pursuing a sexual relationship, and that she was actually the more aggressive one, often actively pursuing him. He feels she enjoyed his attention as well as the sex.... [H]e believed that she was mature enough to decide for herself in sexual matters. He continues to minimize the harm he likely caused [the victim] ….
>
> [Eake] does not have a great deal of insight into his behavior…. [H]e also has a[n] overabundance of focus on

---

[5] Further, while Eake told the PSI writer and the court he only had sex with the victim "one time" before his wife's death, this number is questionable in that he first had sex with her in June 2012, the victim reported that after that Eake had sex with her "almost weekly" for the following two years, and his wife did not pass away until January 1, 2013, more than six months after Eake first had sex with the victim.

himself. He has some guilt, but his regret appears to be for himself rather than for anyone else.

Kaplan's "Summary/Opinion" states in part:

[Eake] has not yet developed the emotional capacity to understand the meaning of his offenses to his victim, her family, or to the community. He is focused on himself, and I don't believe he is currently able to take the bulk of the responsibility for his actions…. *[H]e can certainly benefit from sexual offender treatment*.

(Emphasis added.) Kaplan further wrote that Eake "believes that his sexual appetites are normal for men in his [fifties] age bracket."

¶11 While that was then, and this is now, Eake does not appear today to be much safer for the community than he appeared at the time of sentencing. In addition to indicating that Eake has not even started, much less finished, sex-offender treatment,[6] the report from the PRC referring Eake's petition to the circuit court also suggests Eake continues to have difficulty accepting responsibility for his criminal conduct as it indicates "[h]e reported this offense was the culmination of him self-isolating due to multiple deaths in the family … and the victim living in an abusive home. He lost his mother, father, and brother and pushed everyone away." The record indicates his father did not pass away until almost two years *after* Eake began having sex with the victim, harkening back to his representation to the PSI writer that he began having sex with the victim in part because of his wife's death, even though his wife did not die until six months *after* he began having sex with the victim. The report also indicates Eake was "not willing to state what his struggles were to avoid this situation."

---

[6] The record indicates Eake's failure to begin sex-offender treatment may not be his fault. Regardless, the point is that he has not had sex-offender treatment to help mitigate his danger to the community.

Remarkably, he indicated, "I hurt myself more than I hurt anyone because I hurt my family. I'm not saying this hasn't hurt her," echoing Kaplan's presentencing observation that Eake "expressed regret, mostly because of what he fears will happen to him, rather than because of the effects that his choices may have had on [the victim]." Further, Eake's victim-blaming and failure to take responsibility for his criminal choices do not seem to have subsided as the PRC reports that he indicated, "I know it was wrong from the … first time *she* called me to come over and *she* was laying there bare naked on the couch." (Emphasis added.)

¶12 The report also indicates that as part of his proposed release plan, Eake originally planned to live with "a female friend" if his petition was approved. That plan was "disapproved," however, because "there were minors in the residence and he would have a common area bedroom." We note that the PRC indicates Eake and this "female friend" "may be interested in pursuing a romantic relationship, pending the approval of his agent."

¶13 The PRC noted that Eake will rely for social support on his "family and friends," but the record gives reason to question whether these parties will be of much help in keeping him from committing a similar offense in the future. Specifically, we note that the PSI indicates that "[i]n a letter … signed 'The Eake family' they placed the blame for [Eake's] actions on his wife's death"—which, again, occurred six months *after* Eake began having sex with the victim. The PSI further states "[t]he letter blames the victim and her mother, stating the mother used Mr. Eake and allowed her daughter to drink and alleges the victim was 'flirty' when there were men around." The PSI writer also indicated Eake's daughter "clearly blames the mother of the victim and the victim for [Eake's] actions." As for friends who could provide Eake a base of social support, the PSI writer noted that Eake "has no close friends."

¶14 While the PRC recognizes in its report "the risk associated with an un-treated sex offender being released to the community," it nonetheless concludes that Eake "does not appear to be a risk to the community at this time" because his current "physical symptoms associated with his extraordinary health condition and related treatment" eliminate the risk because "[h]e is easily winded, cannot walk long distances, and has little energy." Eake's modus operandi related to the offense for which he is imprisoned, however, was that he gained the trust of and worked his way into the family life of his next-door neighbor.[7] It would not take much energy or require walking long distances to gain the trust of a future neighbor and commit the same type of offense. We note that Eake indicated to the PRC his intention to begin a "romantic" relationship with a female who has minors living in her home if he is released early. And on this last point, we add that despite the PRC's view on the matter, the record does not convince us Eake is physically incapable of sexually assaulting another teenage girl in the same manner he did with the victim here, especially in light of Eake's own apparent belief he is capable of beginning a new "romantic" relationship if released early.

¶15 Perhaps sex-offender treatment would have helped Eake to accept responsibility, gain insight into his criminal conduct and the harm he caused, and be less of a threat to the public, but he has not had such treatment. The record thoroughly supports the circuit court's exercise of discretion in denying Eake's petition.

---

[7] At the sentencing hearing, the girl's mother expressed how Eake was their "neighbor," their "friend," their "family," and they had "loved" him.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.